## WALLER v. UNITED STATES.
### No. 48602.

Court of Claims.
June 28, 1948.

Henry J. Fox, of Washington, D. C. (Posner, Berge, Fox & Arent, and A. Alvis Layne, Jr., all of Washington, D. C., on the brief), for plaintiff.

Kendall M. Barnes, of New York City, and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and WHITAKER, HOWELL, MADDEN, and LITTLETON, Judges.

WHITAKER, Judge.

Plaintiff entered into contracts with the defendant to furnish it certain petroleum products to be delivered between August 1, 1946 and July 31, 1947. One contract covering a portion of the products was dated July 10, 1946 and another contract covering the balance was dated July 19, 1946. However, invitation for bids had been issued by the defendant on June 17, 1946, and plaintiff's bid was submitted on June 26, 1946.

On July 1, 1946, the petroleum products, for the furnishing of which plaintiff had submitted a bid, ceased to be subject to price control. With the lifting of controls the price of the products to be furnished by plaintiff rose substantially. Plaintiff was a distributor of these products, purchasing them from producers and refiners. Plaintiff, therefore, was compelled to pay for the articles to be furnished under his contracts substantially more than the prices charged therefor at the time he put in his bid. Then the defendant's representative, Harry B. Dyche, who was Assistant to the Director, Bureau of Federal Supply, Treasury Department, executed an amendment to to plaintiff's contracts, substantially increasing the price to be paid plaintiff for the products to be furnished. Payments at the increased prices were made plaintiff, but later the Comptroller General held that these increases had been made without authority of law and he directed that all amounts paid in excess of the amounts originally contracted for be deducted from amounts due under subsequent contracts. Plaintiff sues for the amounts so deducted.

The amendments to the contracts calling for the additional payments are alleged to have been executed under the authority of section 201 of the First War Powers Act of December 18, 1941, 55 Stat. 838, 839, 50 U.S.C.A.Appendix, § 611 which provides:

"The President may authorize any department or agency of the Government exercising functions in connection with the prosecution of the war effort * * * to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made and to make advance, progress and other payments thereon, without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war * * *."

Section 401 of the same Act, 50 U.S.C.A. Appendix, § 621, provides:

"Titles I and II of this Act [of which section 201 is a part] shall remain in force;

818

during the continuance of the present war and for six months after the termination of the war, or until such earlier times as the Congress by concurrent resolution or the President may designate."

By Executive Orders 9001 and 9023, 50 U.S.C.A. Appendix, § 611 note, the Treasury Department was given the authority to amend contracts "whenever, in the judgment of the War Department, the Navy Department, or the United States Maritime Commission respectively [later extended to the Treasury Department by Executive Order 9023], the prosecution of the war is thereby facilitated."

The validity of the action of defendant's representative in amending these contracts depends upon the clause, "whenever he deems such action would facilitate the prosecution of the war." So long as such an amendment would, in the judgment of the contracting officer, facilitate the prosecution of the war it was within his power to make it.

■ Defendant, however, says that this amendment could not "facilitate the prosecution of the war" because the war had long since ceased. We are unable to agree with this contention. No treaty of peace has been signed with either Germany or Japan, our troops were in occupation of these countries in whole or in part, and the administration of their governmental affairs were either wholly or in part subject to the control of our forces. It cannot be said that the war is over so long as the enemy countries are occupied by our troops.

As early as Stewart v. Kahn, 11 Wall. 493, 507, 20 L.Ed. 176, it was said:

" * * * the power [referring to the war power] is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress."

This has been quoted a number of times with approval. Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194; Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375;

Woods v. Cloyd W. Miller Co., 333 U.S. 138, 142, 68 S.Ct. 421.

In Hamilton v. Kentucky Distilleries & Warehouse Co., supra, there was involved the power of Congress to enact a wartime prohibition Act after the Armistice with Germany had been signed on November 11, 1918. At the time suit was brought on October 10, 1919 to enjoin the enforcement of the Act, it appeared that the President had declared that the war had ended and that peace had come; that many war agencies and activities had been discontinued; that the President had declared our enemies were impotent to renew hostilities; and that the Army had been almost wholly demobilized. Peace treaties, however, had not been signed, and certain war measures continued in existence, among others, the operation of the railroads by the President. Under these circumstances the court held that the enactment of the Act on November 21, 1918, and its enforcement on October 10, 1919, was a valid exercise of the war power.

In Kahn v. Anderson, 255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469, the court held that a soldier could be tried for murder before a court martial on November 25, 1918, notwithstanding the signing of the Armistice on November 11, 1918, and notwithstanding the provision of the Articles of War that "No person shall be tried by court-martial for murder or rape committed within the geographical limits of the States of the Union and the District of Columbia *in time of peace.*" Art. 92, 10 U.S.C.A. § 1564. (Italics supplied.)

More recently the Supreme Court in Fleming v. Mohawk Co., supra, held that the provisions of the First War Powers Act, 50 U.S.C.A. Appendix, § 601, authorizing the President to redistribute functions among the executive agencies "in matters relating to the conduct of the present war" were still in effect on December 12, 1946, when he transferred the functions of the Price Administrator to the Temporary Controls Administrator.

Also, in Woods v. Miller Co., supra [333 U.S. 138, 142, 68 S.Ct. 425], the court held that the Housing and Rent Act of June 30, 1947, c. 163, Public Law 129, 80th Congress,

1st Session, 50 U.S.C.A. Appendix, § 1891 et seq., was a valid exercise of the war power, notwithstanding the presidential proclamation of December 31, 1946, declaring the termination of hostilities.

Justice Jackson, in his concurring opinion in the last-mentioned case, stated:

" * * * I find no reason to conclude that we could find fairly that the present state of war is merely technical. We have armies abroad exercising our war power and have made no peace terms with our allies not to mention our principal enemies. I think the conclusion that the war power has been applicable during the lifetime of this legislation is unavoidable."

On July 25, 1947, Congress passed Public Law 239, 80th Congress, 1st Session, 61 Stat. 449, which terminated a large number of wartime and emergency statutes. The Judiciary Committee of the Senate reported that the Act effected immediate repeal of certain statutes, future repeal of others, and left unaffected still others. Accompanying the report was a list of the wartime and emergency statutes and a statement indicating the effect upon them of Public Law 239.

The First War Powers Act was item 261. The report says of it:

"Unaffected. The authority under this provision continues to be required in the liquidation of war and emergency agencies of the Government and for the purpose of retaining existing improved organizational structures of most of the permanent executive departments and agencies, including the War and Navy Departments, pending the consideration by Congress of problems for the permanent reorganization thereof. The authority related to the making of contracts contained in this provision continues to be required pending action by the Congress on proposed legislation with respect to this subject."

It will be noted that the power to amend contracts remained unimpaired, at least such was the intention of the committee.

We recognize that the question before us is somewhat different from those presented in the cases cited. The question before us is whether or not the amendment of these contracts "would facilitate the prosecution of the war." We cannot but conclude.

however, that so long as our armies were occupying enemy territory, and so long as the administration of the affairs of the enemy were under our supervision and control, the war was not over. These armies required petroleum products in the performance of their duties. If petroleum products were no longer available to them, their activities would be seriously hampered.

Certainly it cannot be said that it was impossible that the amendment of these contracts could facilitate the further prosecution of the war. If in fact it was necessary to amend them in order to continue to get petroleum products, then their amendment must of necessity have facilitated the further prosecution of the war. The determination of whether or not their amendment was necessary to facilitate the prosecution of the war, was committed by Congress and the President to the judgment of the proper officer of the Treasury Department.

■ Moreover, the stipulation of facts signed by both parties recites that Dyche, if called as a witness, would have testified, "I determined in good faith that such amendments would facilitate the prosecution of the war"; and the defendant in its brief expressly disavows the intention to argue that the amendments were not made in good faith. It admits, arguendo at least, that they were made in the honest belief that they would facilitate the prosecution of the war. This being true, the courts are foreclosed from inquiring into the question. Congress authorized the amendments of these contracts whenever the Executive Department of the Government was of the opinion that their amendment would facilitate the prosecution of the war; it did not commit to the courts the determination of this question. It is well settled that a court has no jurisdiction to substitute its opinion for that of executive officers, in whom discretion is vested by Congress, at least where the judgment of the executive officer was honestly rendered.

In Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537, the court had under consideration its power to review an act of the President calling the militia into service pursuant to

the authority granted by the Act of February 28, 1795, 1 Stat. 424. That Act authorized him to call into the service of the United States such number of the militia as "he may judge necessary to repel such invasion." This authority he was authorized to exercise whenever the United States was invaded or was in imminent danger of invasion. The court said: "We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." The court further said, 12 Wheat. on page 31:

"Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts. And in the present case, we are all of opinion that such is the true construction of the act of 1795. It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself. In a free government, the danger must be remote, since in addition to the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny."

Later, in Dakota Central Telephone Co. v. South Dakota 1623, ex rel. Payne, 250 U.S. 163, 184, 39 S.Ct. 507, 509, 63 L.Ed. 910, 4 A.L.R. the court had under consideration the power of the President to take over the telegraph and telephone systems of the country. The Act of July 16, 1918, authorized him to do so "whenever he shall deem it necessary for the national security or defense." 47 U.S.C.A. § 63 note. The Court said:

"The proposition that the President in exercising the power exceeded the authority given him is based upon two considerations: First, because there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority; indeed, the contention goes further and assails the motives which it is asserted induced the exercise of the power. But as the contention at best concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."

See also United States v. George S. Bush & Co., 310 U.S. 371, at pages 379-380, 60 S.Ct. 944, 84 L.Ed. 1259.

Congress committed to certain officers of the Executive Department of the Government the power to amend contracts when in their judgment such amendment would facilitate the prosecution of the war. An authorized officer of the Executive Department has determined that the amendment of the contracts in question in this case would facilitate the prosecution of the war, and the parties have stipulated that this determination was made in good faith. Under such circumstances the courts are without power to review his determination.

It follows from this that the plaintiff is entitled to collect the amount stipulated in the amended contracts, and that the Comptroller General was without authority to direct that the amounts paid thereunder should be deducted from amounts due under subsequent contracts.

This case was tried on a stipulation of facts. That stipulation does not show the amount due plaintiff, nor is there anything in the record from which this can be determined. Judgment will be suspended until the incoming of a stipulation showing the amount due, computed in accordance with this opinion, or, in the absence of a stipulation, until the incoming of a report of a commissioner showing the amount due. It is so ordered.

JONES, Chief Justice, and HOWELL, MADDEN, and LITTLETON, Judges, concur.