**LORAL ELECTRONICS CORPORATION**

v.

**The UNITED STATES.**

**No. 363–64.**

United States Court of Claims.

Dec. 15, 1967.

Joseph Sachter, New York City, attorney of record, for plaintiff.

James A. Pemberton, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. John R. Franklin, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM: *

The purpose of the present action is to obtain a review under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964), of a decision that was rendered by the Armed Services Board of Contract Appeals on September 30, 1964. Loral Electronics Corp., 1964 BCA ¶ 4439 (1964) (No. 9174). The defendant has answered the allegations in the petition, the administrative record has been filed with the court, and both parties have filed motions for summary judgment.

The petition was filed on October 26, 1964. Three days later, the Armed Services Board of Contract Appeals amended its decision of September 30, 1964 so as to eliminate one aspect of the deci-

---

* This opinion incorporates, with modification and additions, the opinion prepared, at the direction of the court under Rule 54(b), by Trial Commissioner Mastin G. White.

sion to which the plaintiff had objected in the petition. Consequently, it will not be necessary to discuss the phase of the original administrative decision that was subsequently eliminated from it.

No evidence outside the administrative record has been offered, received, or considered. The summary of the material facts set out in this opinion is based upon uncontradicted evidence found in the administrative record.

It is our opinion, upon reviewing the administrative decision of September 30, 1964, as amended, and the record upon which it was based, that the Armed Services Board of Contract Appeals committed error, and that the plaintiff is entitled to recover in the present action.

The plaintiff is a manufacturer of electronic equipment. During the plaintiff's fiscal years 1958, 1959, and 1960, it was engaged in the performance of five cost-plus-fixed-fee contracts with the defendant, involving the manufacture of electronic equipment by the plaintiff for the Department of the Navy. The several contracts contained figures for estimated costs that aggregated $4,113,-521.55, and they prescribed fixed fees which were to be paid by the defendant to the plaintiff and which totaled $287,-946.

Paragraph 3(a) of the general provisions of each contract stated as follows:

> (a) The Government shall pay the Contractor the Allowable Cost of the performance of this contract determined in accordance with Part 2 of Section XV of the Armed Services Procurement Regulation and the Schedule, plus such fixed fee, if any, as may be provided for in the Schedule.

The provision quoted in the preceding paragraph incorporated in each contract by reference ASPR 15–201, which provided in part as follows:

> The total cost of a cost-reimbursement type contract is the sum of the allowable direct costs incident to the performance of the contract, plus the

properly allocable portion of allowable indirect costs * * *. The tests used in determining the allowability of costs also include (i) reasonableness, (ii) application of generally accepted accounting principles and practices * * *.

In the performance of the several cost-plus-fixed-fee contracts previously mentioned, the plaintiff occupied and utilized a building on a parcel of land located at 825 Bronx River Avenue in the Bronx section of New York City. In submitting its bills to the Department of the Navy for allowable costs incurred during the fiscal years 1958, 1959, and 1960, the plaintiff claimed for each year the sum of $82,621 as reimbursement for the annual rent paid in connection with the use of the premises just mentioned. A controversy arose between the plaintiff and the audit office which the Navy Department maintained at the plaintiff's plant over the allowability of the plaintiff's rental claims, whereupon the dispute was processed administratively under the identical "Disputes" provisions that were incorporated in the several contracts. The matter ultimately reached the Armed Services Board of Contract Appeals (acting for the Secretary of the Navy) on an appeal taken by the plaintiff from the action of a subordinate official in determining that the plaintiff's yearly claim for $82,621 was excessive to the extent of $34,441.35.

In the proceedings before the Armed Services Board of Contract Appeals, no question was raised by the Government regarding the actual payment by the plaintiff of $82,621 per year for the premises at 825 Bronx River Avenue, or regarding the actual use of these premises by the plaintiff in the performance of the cost-plus-fixed-fee contracts for the Navy Department. Furthermore, the Government conceded that $82,621 would represent a reasonable annual rent for such premises. However, the Government contended that the instruments under which the plaintiff occupied the property provided for the acquisition of the land and building by the plaintiff, and,

accordingly, "that the cost reimbursement sought must be reduced to the amount representing the costs of ownership."

In its decision of September 30, 1964, as amended, the Armed Services Board of Contract Appeals held that the instruments under which the plaintiff occupied the premises at 825 Bronx River Avenue "were intended as an acquisition of realty by the appellant [i. e., the present plaintiff]," and, therefore, that the plaintiff was entitled to an allowance based upon the costs of ownership, but not to reimbursement for rental payments in the amount of $82,621 per year, as claimed by the plaintiff. The determination of the proper amount of the allowance was reserved for further proceedings.

Prior to 1956, the plaintiff had conducted its manufacturing operations in a building which was located on Bruckner Boulevard in the Bronx and which the plaintiff occupied under a lease. The City and State of New York were planning to build a new expressway on Bruckner Boulevard, and, in that connection, most of the property occupied by the plaintiff was condemned. The small area not affected by the condemnation was completely unusable in so far as the plaintiff was concerned. The plaintiff was compelled to look for other quarters, and one of its vice-presidents was designated to establish contacts with real estate brokers for the purpose of ascertaining what properties might be available for lease by the plaintiff. It became widely known that the plaintiff was looking for new premises to lease, and the plaintiff received letters and telephone calls from real estate brokers in New York City, from Chambers of Commerce in New Jersey, Connecticut, New York State, and some southern States, and from the governors of several States.

Among the persons approaching the plaintiff was Irving Feder, who indicated that he represented a group owning a parcel of vacant land located in the Bronx, and that this group would construct on the land, and lease to the plaintiff, a building that would meet the plaintiff's requirements. The group of persons represented by Mr. Feder utilized a corporation known as Herbco Realty Corporation and a partnership known as Rofe Associates, although the plaintiff was unaware, during the early negotiations with Mr. Feder, of the business entities through which Mr. Feder's group conducted their operations.

The plaintiff preferred to remain in the Bronx, but it had not been able to find any property there that was adequate for its purposes and available for lease. Accordingly, the plaintiff entered into serious negotiations with Mr. Feder. Leon Alpert, who was the plaintiff's president and chairman of the plaintiff's board of directors at the time, was the plaintiff's principal representative in the negotiations with Mr. Feder.

Mr. Alpert examined the vacant land suggested by Mr. Feder. This was the land previously referred to as being located at 825 Bronx River Avenue. It was sufficient in area to accommodate a building of the size needed by the plaintiff, and it otherwise seemed suitable for the sort of manufacturing done by the plaintiff, although it was filled-in land within an area that had originally been wet and swampy.

Although Mr. Feder offered to provide the land and a suitable building at a rental figure that was generally favorable in comparison with other proposals that had been made to the plaintiff in connection with the possible leasing of buildings in the Bronx and elsewhere, Mr. Alpert did considerable bargaining with Mr. Feder over the rental figure, and was successful in obtaining from Mr. Feder a reduction in the original figure proposed by Mr. Feder. Mr. Alpert testified that Mr. Feder was anxious to make a deal with the plaintiff concerning the utilization of the vacant land; and in order to induce the plaintiff to enter into a lease agreement, Mr. Feder offered to grant the plaintiff an option to purchase the property during the life of the lease. The offer respecting the inclusion of an option agreement

in the transaction appealed to Mr. Alpert as a means whereby the plaintiff could protect itself at the end of the primary term of the lease if the plaintiff should wish to use the property for a further period of time and if the lessor should demand a rent increase for an extension of the lease. Mr. Feder's proposal was accepted by Mr. Alpert on behalf of the plaintiff, and the necessary documents to formalize the understanding were prepared by the attorneys for the parties.

On January 26, 1956, Herbco Realty Corporation, as lessor, leased the land at 825 Bronx River Avenue to Rofe Associates, as lessee, for a term of 16½ years at a rental figure of $8,000 per year.

A lease agreement also was entered into on January 26, 1956 between Rofe Associates, as lessor, and the plaintiff, as lessee. This lease was for a term of 16½ years commencing June 1, 1957. The lease provided that the lessor, at its expense, would construct on the premises at 825 Bronx River Avenue a building in accordance with plans and specifications set out in another document, and that the land and building would be made available for use by the plaintiff, as lessee, at an annual rent of $82,-621. The lease provided that all alterations and repairs (with the exception of structural repairs to the foundation, bearing walls, building supports, and roof structure) should be made by the lessee at its own expense, and that all taxes were to be paid by the lessee.

Another document dated January 26, 1956, was an option agreement between Herbco Realty Corporation, as optionor, and the plaintiff, as optionee. It stated that "In consideration of the mutual covenants and conditions herein contained, and in order to induce the party of the second part [the plaintiff] to enter into a lease with ROFE ASSOCIATES," Herbco Realty Corporation granted to the plaintiff the exclusive option to purchase the property located at 825 Bronx River Avenue up until 5 p. m. on June 30, 1973 (the expiration date was later changed by an amendment to December 31, 1973). The plaintiff had the discretionary power to exercise the option at the end of the third year of the lease period, or at the end of any subsequent year of the lease period, or at the expiration of the 16½-year term of the lease. A schedule was set out in the option, giving a diminishing scale of prices at which the plaintiff could acquire the property at various times. For example, the purchase price at the end of the third year of the lease period was fixed at $765,300, and the purchase price at the expiration of the 16½-year term of the lease was fixed at $100,000.

The option agreement also contained a provision which required the plaintiff to purchase the premises at 825 Bronx River Avenue if such premises were condemned for public use at any time during the life of the lease. This provision set out a schedule of prices identical with the scale of diminishing prices prescribed for application in the event of the discretionary exercise of the option by the plaintiff, except that the second schedule also included alternative purchase prices that would be payable in the event of the mandatory acquisition of the property during the first or the second year of the lease period.

In accordance with the lease agreement of January 26, 1956, with the plaintiff, the Rofe-Herbco group constructed on the land at 825 Bronx River Avenue a building that met the plaintiff's requirements. The cost of constructing the building—$646,000—is being depreciated during the life of the lease. A bank loan in the amount of $600,000 was obtained by the Rofe-Herbco group in connection with the financing of the construction, and the plaintiff's lease and option were, with the plaintiff's consent, subordinated to the mortgage that was given to the lending institution as security for the loan. After the completion of the building, it was turned over to the plaintiff on or about June 1, 1957, for occupancy and use. The plaintiff deposited $100,000 with the Rofe-Herbco group as security for the faithful performance of the obligations assumed by

the plaintiff under the lease agreement. Interest on the $100,000 has been paid to the plaintiff by the Rofe-Herbco group at all pertinent times.

During the plaintiff's fiscal years 1958, 1959, and 1960—the period involved in the present litigation—the premises at 825 Bronx River Avenue were used by the plaintiff in the performance of the five cost-plus-fixed-fee contracts (with which the court is concerned in the present case) involving the manufacture of electronic equipment for the Navy Department.

Throughout the pertinent period, the plaintiff paid Rofe Associates $82,621 per year for the premises at 825 Bronx River Avenue. As previously stated, the Government conceded in the proceedings before the Armed Services Board of Contract Appeals that $82,621 would represent a reasonable annual rent for the premises in question. These payments were shown on the plaintiff's books of account as payments for rent. In its federal income tax returns, the plaintiff reported these payments as business expenses for rent, and no objection was made by the Internal Revenue Service to such classification. Conversely, Rofe Associates, in its federal income tax returns, reported the annual payments of $82,621 from the plaintiff as ordinary income.

Up to the time of the hearing before the Armed Services Board of Contract Appeals in February 1964, the plaintiff had not exercised the option to purchase the property at 825 Bronx River Avenue. Furthermore, Mr. Alpert, the plaintiff's principal officer, testified at the hearing that, on the basis of the plaintiff's situation existing at the time of the hearing, the plaintiff had no intention of ever exercising the option. The reasons for the plaintiff's lack of interest in the ownership of the property at the time of the hearing were stated plausibly and in considerable detail. Nevertheless, the Armed Services Board of Contract Appeals, in its decision of September 30, 1964, as amended, held that the lease and option agreements under which the plaintiff occupied the premises at 825 Bronx River Avenue "were intended as an acquisition of realty" by the plaintiff. Hence, the Board decided that the plaintiff, for its fiscal years 1958, 1959, and 1960, was entitled to an allowance based upon the costs of ownership, but not to reimbursement for rental payments in the amount of $82,621 per year.

An administrative decision on a claim submitted by a Government contractor must, of course, be based upon the underlying facts. Some of the major undisputed facts in the present case are that the plaintiff, in connection with the manufacture of electronic equipment for the Navy Department under cost-plus-fixed-fee contracts, was entitled to reimbursement for its reasonable costs incurred in the performance of the contracts; that the plaintiff was entitled to be reimbursed with respect to reasonable amounts expended for the rental of premises used in the performance of the contracts; that the plaintiff occupied and used the premises at 825 Bronx River Avenue in the performance of the contracts; that such occupancy and use were under a lease; that the plaintiff paid the lessor the sum of $82,621 per annum as rent for the premises at 825 Bronx River Avenue; that $82,621 per year represented a reasonable rental figure for the premises at 825 Bronx River Avenue; that, although the plaintiff held an option to purchase the premises at 825 Bronx River Avenue, the plaintiff had not, at any time during the period involved in this case, exercised the option or acquired any ownership interest in such premises; that (as the Board determined in reopened proceedings) the building had a useful life of no more than 25 years; and that there was no question of bad faith in the transactions. Another fact is that the plaintiff could, at the expiration of the 16½-year term of the lease, exercise the option and acquire the premises at 825 Bronx River Avenue for $100,000, or the exact amount of the security deposit which the plaintiff furnished to the

Rofe-Herbco group in connection with the original occupancy of the premises.

In addition, there was the testimony of plaintiff's principal officer, not contradicted, to the effect that the plaintiff had not at any time, from the inception of the transaction down to the date of the hearing, formed an intention to exercise the option ultimately and thus acquire the ownership of the property. The reasons for the plaintiff's lack of interest in the ownership of the property as of the time of the hearing were, as previously indicated, given plausibly and in considerable detail.

■ On this record we do not accept the determination of the ASBCA that the lease and option agreements "were intended as an acquisition of realty" by the plaintiff—i. e. that the plaintiff and the Rofe-Herbco group intended, when they entered into the lease and option agreements, that the plaintiff should exercise the option prior to its expiration and thus acquire the ownership of the premises at 825 Bronx River Avenue. The Board correctly stated that the trier must look to the facts and circumstances showing the parties' intention at the time of the execution of the agreement. See, e. g. Benton v. Commissioner of Internal Revenue, 197 F.2d 745 (C.A.5, 1952); Breece Veneer & Panel Co. v. Commissioner of Internal Revenue, 232 F.2d 319 (C.A.7, 1956). But the Board's explanation of its reasoning is so summary and sketchy that we cannot really tell the basis of its decision or whether that holding was thought to rest on solid findings of subsidiary facts or on some legal concept which may well have been mistaken. For instance, the Board does not ever say that it disbelieved or discredited Mr. Alpert's explicit and uncontradicted testimony as to his intentions with respect to the option. True, there is some suggestion that the board may not have believed "that the option was simply thrown in as a sort of bonus to tip the negotiations in favor of the lease", but even then all the opinion says is that "it is hard to reconcile" that particular evidence with the various transactions between the parties—and the entire sentence appears, not in the lengthy portion of the opinion stating the findings of fact, but in the short portion labeled "Decision". There follows a summary listing of factors, without explanation of their bearing, which "taken collectively lead the Board to conclude that the sale and option were intended as an acquisition of realty" by the plaintiff. Then, the Board ends by holding that the building had a 40-year useful life, while a later hearing by the Board concluded that a 25-year life was more appropriate.

In these circumstances we cannot give as much deference to the Board's determination as if it had given detailed findings to support, and fuller explanations of the reason for, its conclusion. We are compelled to look to the record without much help from the Board's opinion, and therefore without the need to accord as great weight to its determination as we otherwise would. Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

■ When we scan the record, we are satisfied that, if the correct legal standard is applied, there is no substantial evidence to sustain the Board's determination, in the sense that "substantial evidence in the record as a whole" is now used in administrative law. See Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 582, 171 Ct.Cl. 30, 37–38 (1965). The factors indicating that the lease was truly such far outweigh the minor hints that a sale was intended. The Board itself has found the rental payments reasonable and not out of line. Both parties treated these payments as rent. The $100,000 to be paid if the option were exercised at the end of the lease-period is not so far away from a forecast of the value of the property at that time as to be suspicious. Above all, we see no adequate reason to discredit Mr. Alpert's testimony as to the plaintiff's intention at the time of the lease (and the Board did not say that it did) and we therefore take it that the Board accepted that testimony. The later-occurring events which may have made the property more

valuable cannot alter that original intention. In our view, the several factors summarily mentioned by the Board in the "Decision" part of its opinion as leading it to its conclusion are all as consistent with a lease-arrangement as with an acquisition. As a whole, we view the Board's decision as resting on suspicion rather than on proven facts. We are justified, therefore, in overturning its result because the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 71 S. Ct. 456, 466, 95 L.Ed. 456 (1951).

It follows that the Board erred in holding that the plaintiff, under its cost-plus-fixed-fee contracts with the defendant, was entitled to an allowance based upon the costs of ownership with respect to the use of the premises at 825 Bronx River Avenue, but not to reimbursement for rental payments in the amount of $82,621 per year.

In a second supplemental answer and counterclaim filed by the defendant on November 17, 1966, the defendant alleged that in proceedings to determine the amount due the plaintiff under the administrative decision of September 30, 1964, as amended, the Armed Services Board of Contract Appeals adopted an erroneous formula for calculating the plaintiff's allowance based upon the costs of ownership, and that this formula resulted in the plaintiff being paid $82,621 for each of the years involved in the present litigation. The defendant counterclaimed for the difference between $82,621 and "reasonable costs of ownership." In replying to the defendant's second supplemental answer and counterclaim, the plaintiff denied that it had been paid $82,621 per year under the Board's formula.

For the reasons stated earlier in this opinion, the defendant's counterclaim should be dismissed. However, the pleadings with respect to this phase of the case raise a question regarding the amounts that have actually been paid to the plaintiff by the defendant respecting the use of the premises at 825 Bronx River Avenue during the plaintiff's fiscal years 1958, 1959, and 1960. This question can be resolved in subsequent proceedings under Rule 47(c) (2). The defendant expressly agreed at oral argument that, in the event the court held for plaintiff on the issue of liability, the case need not be returned to the Board for computation.

Accordingly, the plaintiff's motion for summary judgment is allowed, with the amount of the recovery to be determined under Rule 47(c) (2); the defendant's cross-motion for summary judgment is denied; and the defendant's counterclaim is dismissed.

COLLINS, Judge, took no part in the decision of this case.